## FARMERS' NAT. BANK et al. v. SANSING. (No. 3262.)

(Court of Civil Appeals of Texas. Texarkana. May 27, 1926.)

1. **Banks and banking ⬅67—Bank, purchasing assets of insolvent bank, held not, under the facts, liable for Liberty bonds subscribed by plaintiff for purpose of enabling insolvent bank to reopen.**

Where, to enable failing bank to reopen, a popular subscription of funds was sought, and plaintiff pledged Liberty bonds as his part of subscription, and one accepting bonds signed agreement to return them if certain amount was not subscribed to by certain date, and bank accepted bonds in good faith without knowledge of such agreement, and was permitted to reopen, *held*, that defendant, which subsequently purchased assets of bank on its becoming insolvent, was not liable to plaintiff for return of such bonds or their value.

2. **Banks and banking ⬅67—Evidence held not to show liability of defendant bank, purchasing assets of insolvent bank, for bonds pledged by plaintiff as part of subscription fund to enable insolvent bank to reopen.**

Even though insolvent bank, assets of which defendant bank purchased, was liable in assumpsit for accepting Liberty bonds pledged by plaintiff as part of subscription fund to enable insolvent bank to reopen, *held*, that defendant is not liable for such bonds, where plaintiff did not sustain burden of proving that his bonds were among those transferred to defendant; plaintiff's claim not being assumed by defendant.

Appeal from District Court, Delta County; J. M. Nelson, Judge.

Action by S. P. Sansing against the Farmers' National Bank and others. Judgment for plaintiff, and the Security State Bank and another appeal. Affirmed in part, and reversed and rendered in part.

The suit was brought by appellee to recover the possession of certain Liberty bonds, or, in the alternative, their value. The nature of the suit, as well as the defense, appears more distinctly from the facts of the case. The doors of the Farmers' National Bank of Cooper, Tex., were closed for business on May 13, 1920, by the national bank examiner for the district. The capital of the bank had become greatly impaired and lessened, and all of its available funds and assets were not sufficient to fully and adequately pay its debts to the depositors. It had become insolvent from causes not explained in the record. But the stockholders and directors desired to avert the appointment of a receiver, and decided to provide at once the means to pay depositors and to continue the operation of the bank. The board of directors were to act as a committee to devise the ways and means to do so. The authorized capital stock of the bank was $50,000, and it was evident that a

full legal assessment against the stockholders of $50,000, together with available funds and the collectable assets, would not be sufficient to meet the debts of the bank and enable it to continue business. Thereupon, with the consent of the stockholders, the directors of the bank met on May 19, 1920, and determined to meet such situation by seeking a popular subscription of funds from certain citizens, with the view of obtaining additional means with which to pay the bank's debts and to reopen and continue the operation of the bank. It was determined by the board that, in addition to the sum of $50,000 to be paid by the stockholders, $120,000 was necessary in order to enable the bank to restore its capital and funds and reopen for business. The real purpose of the $120,000 was to take the place of "bad assets" which were to be "eliminated." The bank examiner approved the plan so adopted by the board, and notified the Comptroller of Currency of the proposed plan, recommending its acceptance. The bank examiner, then, for the board, appointed W. H. Jones, a nominal vice president and a director of the bank, as trustee of the fund. Jones executed the necessary bond, and was to collect from the subscribers the amount pledged. The following form of written agreement was drawn up and approved by the directors and the bank examiner, which was to be signed by each subscriber agreeing to do so:

"Know all men by these presents: That for and in consideration of the sum of one dollar, to each of us in hand paid, the receipt of which payment is hereby acknowledged, and other good and valuable considerations, each of the undersigned agrees to pay in cash or its acceptable equivalent (only Liberty bonds to be accepted in lieu of cash) to W. H. Jones, trustee, the amounts subscribed opposite our respective names.

"It is understood and agreed that the moneys derived from these subscriptions shall constitute a fund of not less than one hundred twenty thousand ($120,000.00) dollars, to provide for any impairment of the capital stock of the Farmers' National Bank of Cooper, Texas, after the assessment of 100 per cent. on the present stockholders of the bank has been assessed, and for any irregularities that may appear or develop in the individual accounts, or general ledger accounts of the books, now or hereafter, and such portion of the subscriptions herein and hereby made, as shall not be needed to meet any present needs, shall be deposited in the Farmers' National Bank of Cooper, Texas, by said W. H. Jones, trustee, with a copy hereof, to be held by the said bank, to provide for any discrepancy or irregularity that may subsequently develop.

"But it is further understood and agreed that after the expiration of eighteen (18) months from the date hereof, and portion of the funds hereby subscribed and provided shall be returned to the said subscribers, pro rata to their respective subscriptions that have not been used under this agreement.

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"The purpose of this subscription and agreement is to provide funds to meet losses, or deficiencies, or any irregularities of any kind or character, in the affairs of the Farmers' National Bank of Cooper, Texas (which bank is now in charge of the national bank examiner), to enable the bank to resume business. It is understood and agreed that permission from the Comptroller of the Currency for the said bank to resume business shall constitute, in so far as the signers hereto are concerned, an acceptance by the bank for reimbursement to it under the terms of this agreement. Subsequent to the reopening of the bank the propriety of the claim shall be determined by any officer of the bank and the said W. H. Jones, trustee, or in his absence, Dr. J. A. Blackwell, or other substitute appointee by the signers hereof."

The contract was signed by 54 citizens, who each agreed to pay the amounts fixed by them. This contract was presented to appellee, and he agreed to and did sign same; himself fixing opposite his name the amount of $2,500 as payable by him. Forty-six signers preceded his name. At the same time appellee signed the contract he delivered over to W. H. Jones Liberty bonds in the amount of $2,500, and presented to him for signing the following:

"Received of S. P. Sansing $2,500.00 in United States Liberty bonds. We agree to return this amount of United States bonds to S. P. Sansing on or before July 15, 1920, if the full amount of the $120,000.00 guaranty fund and the 100 per cent. assessment of the $50,000.00 capital stock is not subscribed and paid in in full, in cash or United State Liberty bonds, on or before July 10, 1920. Jim Bond to say whether this receipt is complied with or not. This the 24th day of June, 1920."

W. H. Jones signed said paper as follows: "W. H. Jones, Trustee." At the time W. H. Jones signed the paper, he made out and signed an itemized list of such bonds, reciting the numbers and amounts of the bonds, and delivered such list to appellee. Appellee was not a stockholder in the bank. W. H. Jones turned over to the bank examiner all the subscriptions in money and bonds, including appellee's bonds, raised on the contract. According to the testimony of the bank examiner the stockholders' assessments and the subscriptions of the $120,000 were collected in full. The seeming doubt in the evidence is as to whether the subscriptions were all paid in money or bonds precisely on July 10. The bank examiner notified the Comptroller of Currency, by telegram on July 13, that the money necessary to reopen the bank had been raised and that he consented to the reopening of the bank for business, which was formally done on July 15, 1920. There was no remainder of the trust fund over the shortages and debts of the bank. Thereafter the bank continued to operate until January, 1921, when its doors were again closed for insolvency and it was placed in the hands of R. M. Love, as receiver. The receiver, on May 17, 1921, applied to the judge of the federal court for an order of sale of certain assets of the bank, and such order was duly granted. Such assets included, besides other things, the following: "Bonds, $85,667.60." The listed liabilities of the bank very nearly equalled the listed assets. More than one-half of the assets consisted of "loans and discounts." The evidence does not disclose that the particular bonds delivered by the appellee were included in the said list of "bonds." The application of the receiver stated that—

"The receiver of said bank has negotiated a sale of certain assets of the bank to the organization committee of the Security State Bank of Cooper, a banking corporation duly organized and incorporated, or proposed to be organized and incorporated, under the laws of Texas, and domiciled in Cooper, Delta county, Texas, and said proposed sale has been authorized by the Comptroller of Currency, and said receiver now applies for an order authorizing him to consummate such sale as provided by article 5234, Revised Statutes of the United States; that the said assets are proposed to be sold and the terms of said proposed sale are as follows: The organization committee of the said Security State Bank of Cooper proposes to purchase all the assets of said Farmers' National Bank of Cooper, as such assets existed on January 15, 1921, and as listed in Exhibit A presented herewith, with all the accrued interest thereon, including all collections made or that may be made of principal and interest of such assets since January 15, 1921, less all costs and expenses of receivership or incident thereto, and also less the assets amounting to $50,000 as listed in Exhibit B presented herewith, and less all collections since January 15, 1921, made or that may be made of principal and interest of said assets scheduled in Exhibit B. Said purchase by said organization committee also includes all collections from stockholders under assessments against stockholders and all rights in law or equity to collect such assessments. In consideration for the assets and rights proposed to be purchased by the said organization committee hereinbefore stated said organization committee proposes to provide for the payment in full of all debts of the said Farmers' National Bank as shown by its books and as listed in Exhibit C herewith, and will provide a cash fund for the amount of all deposits not included in the above-mentioned agreement as shown by the books of said Farmers' National Bank, and will also settle all other debts as shown by its books to the satisfaction of the respective creditors."

The federal judge granted the application and entered an order in the terms of the application. The receiver of the Farmers' National Bank and the organization committee of the Security State Bank signed a written agreement of sale in the terms of the order on May 30, 1921. Later on application to the federal judge the above agreement and the former order of the court were modified to contain the following:

"It is, however, expressly agreed and understood by and between the parties to this contract

that the Security State Bank does not assume any liability, nor does it in any way obligate itself to pay any judgment or judgments that may be rendered against the Farmers' National Bank in any suit or suits now pending in any of the courts of the country, but, on the contrary, expressly disclaims any connection or interest in such suits."

The Security State Bank of Cooper was duly incorporated under the laws of Texas on June 1, 1921, as a banking institution, with the authorized capital of $100,000. It thereafter carried on business and operated under the franchises of its charter. The Security State Bank consisted, in part, of the stockholders of the Farmers' National Bank. It denied that it was intended as a reorganization of the Farmers' National Bank. The Security State Bank took over by transfer under the terms of the agreement and order of court the assets mentioned therein of the Farmers' National Bank, including, as stated, "Bonds, $85,667.60." It is not shown that appellee's bonds were in this list, or that the Security State Bank ever had possession of appellee's bonds. The Security State Bank continued to operate until January 23, 1925, when the banking commissioner of the state took charge thereof under the statute because of insolvency. Its affairs are now being administered under the state laws by the said commissioner.

The appellee brought the suit in September, 1920, first against the Farmers' National Bank. After said bank was placed in the hands of a receiver in January, 1921, the receiver was made a party defendant. The petition was later amended and the Security State Bank was made a party defendant. After its closing in January, 1925, the state banking commissioner was made a party defendant. The suit was based on the paper signed by W. H. Jones, trustee. As grounds for action the appellee alleged:

"That the conditions named in said receipt and agreement were not complied with, in that the sum of $50,000 assessment on the capital stock was not subscribed and paid in by July 10, 1920, by the stockholders in said bank, neither was said sum of $120,000, called the guarantee fund, subscribed or paid to the defendant (Farmers' National Bank) either in cash or Liberty bonds by July 10, 1920, by the subscribers thereto, by reason of which defendant (Farmers' National Bank) became liable to the plaintiff on and immediately after July 10, 1920, to return to him said Liberty bonds described above or a like amount in other bonds of like value; that, notwithstanding the defendant's duty to plaintiff as set out above, it has ever since said date kept possession of his bonds and has, without his consent, converted them to the use and benefit of the bank, and has refused to deliver said bonds to the plaintiff or to deliver to him any other bonds in lieu thereof, although it has often been requested to do so, by reason of which the defendant is liable to the plaintiff for the value of said bonds, being $2,500, with interest thereon from July 10, 1920."

Liability of the Security State Bank to appellee was predicated upon the grounds that it received and converted the bonds to its own use. and benefit, and also that it had both expressly and impliedly assumed the obligation of the Farmers' National Bank to repay appellee for the bonds in the purchase of the assets of the Farmers' National Bank. The Farmers' National Bank and its receiver entered a general denial, and specially pleaded that W. H. Jones, trustee, was without authority to execute the alleged receipt in its terms; that the terms of the receipt have been fully met; and that the assessment of $50,000 and the subscriptions aggregating $120,000 were all raised and collected in full prior to July 10, 1920. The Security State Bank and the state commissioner of banking specially denied that said bank assumed any obligation owing appellee, or in any way became obligated to the appellee concerning the bonds, and specially denied that it had purchased or received from the Farmers' National Bank bonds of appellee's and specially pleaded estoppel. The case was tried upon special issues, and in keeping with the verdict the court entered judgment for the appellee for $2,849 against the receiver of the Farmers' National Bank and the Security State Bank and the state banking commissioner. From this judgment, the state banking commissioner and the Security State Bank have appealed.

The jury made the following findings: (1) That the $50,000 and the $120,000 were not subscribed and paid (in cash or Liberty bonds) on or before the date of July 10, 1920; (2) that the Liberty bonds turned over by the plaintiff to W. H. Jones were delivered to the Security State Bank by the receiver as a part of the assets of the Farmers' National Bank; (3) that under the contract with the receiver of the Farmers' National Bank the Security State Bank expressly assumed the payment of the debts and liabilities of the Farmers' National Bank; (4) that the Security State Bank had notice of the plaintiff's claim by suit at the time it agreed to purchase the assets and to pay the stated liabilities of the Farmers' National Bank; (5) that the assets of the Farmers' National Bank were of greater value than its liabilities at the time the Security State Bank purchased such assets.

The first finding above has doubtful support in the evidence. The weight of the evidence strongly shows that the subscriptions aggregating the $120,000, as well as the stockholders' assessment, were paid in full in cash and bonds by the date of July 10, 1920. At least they were fully paid in cash or bonds and were turned over by W. H. Jones, trustee, to the bank examiner for the board or committee by July 13, 1920, when the bank examiner so notified the Comptroller of Currency. There is no evidence of any probative force to warrant the second finding of fact. There is evidence that the Security State

Bank received "bonds, $85,667.60," but it does not appear that the particular bonds of appellee's were in the list. Appellee himself said: "I could not say that the Security State Bank received those bonds." As shown by the agreement and the orders of the federal judge, the Security State Bank did not obligate itself to pay that character of obligation such as the appellee claims, and there was no special agreement otherwise.

L. L. James, of Cooper, for appellants.

Joel H. Berry and C. C. McKinney, both of Cooper, for appellee.

LEVY, J. (after stating the facts as above). [1] The pertinent and controlling question arising under the pleadings and the evidence is that of whether or not the appellee is entitled to recover of the bank the particular bonds, or their value, delivered by him to W. H. Jones on June 24, 1920. That depends, first, upon the construction of the paper signed by W. H. Jones, in view of the circumstances under which it was given. The paper is an agreement collateral to the subscription paper signed by the appellee and other persons. It does not purport to change or alter in any wise the terms of the subscription paper. It evidences the purpose and intention to impose a proviso or condition upon the present possession of the bonds at the time they were turned over to W. H. Jones. The bonds were to be returned to appellee "on or before July 15, 1920," in case "the full amount of the $120,000 and the 100 per cent. assessment of the $50,000 capital stock is not subscribed and paid in full, in cash or Liberty bonds, on or before July 10, 1920." Clearly the appellee was not intending at that time to deliver over the bonds to W. H. Jones for the board or committee of the bank in satisfaction of or compliance with the subscription. The appellee intended to retain the title and the possession of the bonds until the prescribed proviso or condition was fully met, and then, at the date mentioned, to have same applied in satisfaction of the compliance with the subscription paper signed by him. The bonds were not to be paid over in satisfaction of his undertaking in the subscription paper before or unless the prescribed condition was fully met by the date mentioned. And it was intended to have W. H. Jones retain the bonds and not part with the control of the same until the proviso or condition under which such bonds came into his possession was fully complied with by the date mentioned. The parties were dealing entirely with the present and temporary possession of the bonds, and the custody and control of the same up to the date of July 10, 1920. Such being the nature and extent of the agreement, it, in effect, constituted W. H. Jones a mere holder of the bonds, as an agent of the appellee for the purpose, although W. H. Jones described himself as trustee. He

was not authorized to enter into such undertaking in behalf of the committee or the bank as beneficiary of the subscription paper. He was a mere trustee, and not a general agent, of the bank committee, to collect and receive the subscriptions agreed to be paid by the subscribers to the subscription paper. Appellee was fully aware of the authority of W. H. Jones. Acts done outside of such special authority were alone upon his individual responsibility. As a mere trustee he could not render the committee or the bank as beneficiary liable to a third person by such agreement as is shown. In parting with the control of the bonds before the date mentioned W. H. Jones, and not the bank committee or the bank, would be responsible to appellee for any loss or hurt occasioned by the act. And the evidence does not show that at the date W. H. Jones turned over the particular bonds to the bank committee or the bank examiner the bank committee or the bank examiner had notice of the particular paper signed by W. H. Jones. As far as the evidence goes to show, the bank committee and the bank examiner, in good faith, took and received the bonds from W. H. Jones in virtue of the subscription agreement signed by appellee.

On the faith and reliance of these bonds and the other subscriptions the bank examiner, on July 13, 1920, notified the Comptroller of Currency that the required funds were raised to reopen and operate the bank. The bank then was authorized to formally open for business on July 15, 1920; which it did. If the bank or the committee knew of appellee's claim in virtue of the agreement with W. H. Jones it was after the bank was permitted to formally reopen and operate. At that time the bank was not in a position to legally lessen the fund provided under consent of the Comptroller of Currency as a legal requisite to reopen and operate the bank. At the time it was permitted to reopen the bank it had received all such fund, including appellee's subscription, in good faith and without notice of any outstanding proviso or condition. And the evidence properly considered goes to show that the proviso or condition in the Jones' agreement had been complied with, that the stockholders' assessment and the $120,000 subscription had been paid in cash or Liberty bonds by July 10, 1920. The bank examiner's testimony affirmatively shows that such amounts in cash and bonds were actually delivered over to him; he being in charge of the bank at the time. Therefore, in the circumstances, the appellee is not shown to have a cause of action against the bank.

[2] But assume that the appellee has shown a liability against the Farmers' National Bank, in assumpsit for taking and receiving the benefits of the bonds: The Security State Bank or the state banking commissioner would not be liable in the circumstances. First, as far as shown by the evidence, the

Security State Bank did not receive or come into possession of the particular bonds of appellee. At least the evidence does not tend to show such fact sufficiently to predicate a judicial finding that it did receive the bonds. The Farmers' National Bank at the time it reopened on July 15, 1920, had more than $90,000 in bonds, and the bonds transferred to the Security State Bank on June 1, 1921, amounted to "$85,667.60." It is a matter of conjecture that the appellee's bonds were among the $85,667.60. Appellee himself says: "I could not say that the Security State Bank received the bonds." The burden of proof was upon the appellee. Second, the judgment of the trial court, as recited, seems to be founded upon the fact of the Security State Bank's having assumed to pay the obligations of the Farmers' National Bank. In that respect it cannot be said in the record that the Security State Bank did assume to pay the claim of appellee as an existing obligation or otherwise of the Farmers' National Bank. According to the terms of the undertaking and the orders of the federal judge in respect thereto, no character of obligation such as the appellee asserts against the Farmers' National Bank was included or intended to be included. The appellee's claim was in suit at the time, and was not "a deposit" or a claim on "its books" or "a debt" admitted or recognized by the Farmers' National Bank or its receiver. The terms of the undertaking, approved by order of the federal judge, expressly excludes all "suits now pending in the courts."

Therefore we have concluded that the judgment, so far as it pertains to the appellants the Security State Bank and the state banking commissioner, should be reversed, and that judgment should be here rendered in favor of such appellants. It is accordingly so ordered. The appellee, S. P. Sansing, to pay costs of appeal and costs incurred by said appellants in the trial court. The judgment as to the other defendants will remain undisturbed; they not having appealed therefrom.

Affirmed in part, and reversed and rendered in part.